## BIDS FOR USE IN THE ALTERNATIVE OF VARIOUS MATERIALS AND METHODS OF CONSTRUCTION.

Superior Court of Cincinnati.

STATE OF OHIO, ON THE RELATION OF CHARLES F. WALTZ, V. JAMES A. GREEN, ET AL, COMPOSING THE NEW COURT HOUSE BUILDING COMMISSION FOR HAMILTON COUNTY, AND THE CHARLES McCAUL COMPANY.*

D'ecided, May 5, 1915.

*Building Commissions—Award of Contract for a New Court House— Bidding in the Alternative—Individual Laches of a Tax-Payer Seeking to Enjoin Performance of a Public Contract—Not a Bar to His Suit in the Representative Capacity of a Tax-Payer—Sections 2333, 2338 and 2355.*

1. A court house building commission constituted under the provisions of Sections 2333, 2338, General Code, inclusive, is governed by the provisions of Section 2355, General Code, requiring contracts to "be awarded to and made with the person who offers to perform the labor and furnish the materials at the lowest price." The decision in *Mackenzie* v. *State*, 76 O. S., is abrogated by the subsequent amendment of Section 2338, General Code.

2. Where the controlling statute requires public contracts to be awarded to the lowest bidder, specifications are valid which call for bids upon the use in the alternative of various materials and methods of construction, and the final adoption of alternatives may be re-· served until all bids have been opened and computed. *State* v. *McKenzie*, 9 C.C.(N.S.), 105, not followed.

3. One who sues as a tax-payer to enjoin the performance of a public contract on the ground that the specifications therefor are invalid is not estopped by the fact that as an advocate of unsuccessful bidders he endeavored to procure for them the award of the contract; nor because of such fact will his suit be dismissed on the ground of a total want of good faith. As such tax-payer sues in a purely representative capacity his action is not barred by individual *laches*, notwithstanding the alleged invalidity of the specifications might have been known to him three months before the institution of suit, and in the interim large public expenditure has been in-

*Affirmed by the Court of Appeals, *State, ex rel*, v. *Green et al*, 22 C.C. (N.S.), 1; motion to require the Court of Appeals to certify its record overruled by the Supreme Court June 4, 1915.

curred and important public interests have become involved upon the faith of such specifications.

*Kinkead & Rogers* and *Galvin & Galvin,* for relator.

*John V. Campbell* and *Chas. A. Groom,* Prosecuting Attorneys, for Court House Building Commission.

*Pogue, Hoffheimer & Pogue,* for the McCaul Company.

MERRELL, J.

This is an action brought on the relation of Charles F. Waltz, as tax-payer, against James A. Green and others, constituting the new court house commission for Hamilton county, and the Charles McCaul Company. The commission has entered into a contract with the McCaul Company, a Philadelphia concern, for the construction of a new court house for Hamilton county, and the contractor has entered upon the work of the construction. The relator seeks to enjoin further proceedings under the contract and to have the contract declared invalid on the ground chiefly that bids were called for upon alternative specifications. It is the relator's position that the building commission was obligated by law to award the contract to the lowest bidder, and that inasmuch as the commission did not determine which alternatives it would select until after the bids upon every possible alternative were opened and examined, it was impossible that there should be in the legal sense an award to the lowest bidder.

Before considering this question, which is fundamental in the case, it must be determined whether the relator is entitled to maintain this action. The defendants, the building commission and the McCaul Company, have filed separate answers, differing in form but substantially similar in presenting certain defenses. These defenses are that the relator by his conduct pending the consideration of bids submitted, has estopped himself to attack the contract actually entered into; that he is guilty of *laches;* that though in fact a tax-payer, he brings this action not as a tax-payer, but as the representative, so to speak, of disappointed bidders, and that consequently his appeal to this court of equity is not in good faith.

It appeared in evidence that the relator is the active official of an association of building contractors, a number of the mem-

bers of which were bidders upon part or all of the work of constructing the new court house; that when the bids were opened the relator was persistent and zealous in endeavoring to secure the award to Cincinnati bidders with whom he was to some degree associated; that he attended nearly all the meetings of the court house commission, and both by written and oral argument importuned the commissioners in the interest of securing the award to local bidders. It further appeared in evidence that certain of the Cincinnati bidders, members of the association of which Waltz is the executive officer, had either promised to contribute to a fund for the prosecution of this suit, or had at least expressed a willingness to do so if called upon.

Upon the situation thus disclosed it might with reason be thought that the relator has occupied inconsistent positions with respect to the building contract here in question, having at first sought an award of that contract to those he represented, upon the theory that such award would be a valid one, and failing to secure the award as desired, is seeking now to contest its validity. Again the support, moral and possibly financial, given the relator by certain unsuccessful bidders suggests a doubt as to whether the interest of the tax-paying body was the sole or even the chief incentive for the institution of this action. Notwithstanding these appearances, I am of the opinion that the relator is not estopped to be heard in this action, nor are his rights as a tax-payer invalidated. The relator's activity in seeking the award of the contract to those he represented does not work a technical estoppel to question the validity of the contract entered into, and his private interests, if such he has, can not be taken to overshadow or eliminate the rights of the tax-payers generally whom he has assumed to represent.

On the question of what extent of good faith will be required of the relator in a tax-payer's suit, counsel on both sides have commented extensively upon the authorities in this state. In the view I take of the authorities a detailed examination of them would be beside the point. Undoubtedly a court of equity will reserve the right to refuse a hearing to one who sues in the guise of the public-spirited citizen while in truth being nothing more than the instrument of some special interest, possibly in-

imical to the general good. On the other hand to refuse the suit of a tax-payer merely because the individual relator happens to have a private or special interest in the subject-matter of the suit would in practice amount to a repeal of the statute authorizing the individual tax-payer to vindicate the public interest in the courts.

There is no substantial conflict in the decided cases upon the question here considered and I content myself with the mere statement of the conclusion here reached that the relator is not estopped to maintain this action, nor is he debarred by a total want of good faith.

On the other hand, the defense of *laches* is one that, upon the facts in evidence, requires serious consideration. On December 11th, 1914, almost four months before this action was begun, the building commission adopted plans, specifications (including alternatives) and estimates of the cost of the proposed structure. Bids were invited upon these precise specifications, and proposals were received and opened on February 16th, 1915. On March 16th, after careful computation of bids, and after much discussion in which relator took a leading part, the commission made its selection of alternatives and awarded the contract, which was actually executed April 1st, 1915. On April 3d, the relator requested the prosecuting attorney to institute this action, and the request being refused, this suit was filed April 6th, 1915.

In this action, it should be noted, the relator seeks to compel the rejection of all bids, upon the ground that the specifications, publicly adopted more than three months before, are not in compliance with the statute law. It might well be thought, therefore, that the relator's delay under the circumstances, large sums of public money having in the meantime been expended for advertising and in other ways, should debar him from maintaining this action. The suggestion of counsel that relator could not know, until the contract was actually signed, whether the building commission would persist in its attempted procedure, is technical rather than substantial.

However, notwithstanding the considerations thus outlined, I do not base my decision upon the defense of *laches,* and in this I am in a measure sustained by the decision in *State, ex rel,* v.

*Cass*, 13 C.C.(N.S.), 419, and by the broad scope of Section 2921 and Section 2922 by favor of which this action is brought. Moreover, it must be borne in mind that in the present suit it is not the interest of an individual that is sought to be vindicated, but the rights of all tax-payers of the county. Those rights, whatever they may be, may not be put aside because of an infirmity in the position of the particular tax-payer who as relator assumes to represent the public interest.

I come, therefore, to the consideration of the substantial issues in the case. These I have already indicated, but they should perhaps be stated more fully.

The specifications for the general construction of the court house are elaborate and apparently carefully prepared. They were drawn so as to permit of the reception of lump bids upon the entire construction or bids upon one or more branches of the work. Moreover, bids were called for based upon alternative methods of construction or the use of alternative materials in several important features of the construction. Thus, bids were invited for the construction of the entire building of granite, or, in the alternative, for the use in the superstructure of marble, sandstone or limestone. Intending bidders were also invited to give estimates for furnishing revolving doors for the various chief entrances, or in the alternative, for swinging doors. And, again, estimates for the construction were asked for including the use of fire prevention screens at the intersection of corridors, or in the alternative, omitting such screens. A further alternative about which much discussion has centered was one whereby the bidder is asked to make his estimate inclusive of the demolition of the old court house, or in the alternative, excluding the work of demolition.

Not until after the bids had been received upon all the alternatives referred to and others, and not until after computations had been made of the various bids figured upon the use in one case of certain alternatives, in another case of other alternatives, did the commission determine which alternatives it would select. It is contended on behalf of the relator that this course of procedure is contrary to law and invalid for the reason that it opens the door to favoritism or collusion between the commission and

intending bidders, in that the commission by the choice of one set of alternatives rather than another set might bring about the success of a certain bidder or group of bidders and the defeat of other bidders or sets of bidders. It is the contention that the statute law governing the building commission requires the award to be made to the bidder or bidders offering to do the work of construction at the lowest price and that where the choice of alternatives is reserved to the commission until after all bids have been submitted and computed, there can be in a mathematical sense no determination of the lowest bidder, and the making of any award necessarily lies in the whim or independent judgment of the building commission, exercised quite apart from the determination of who is the lowest bidder. Otherwise expressed, the argument is that under the method of award thus described, it is possible for the building commission by the choice of alternatives, to make "low" any bidders or bidders whom they desire to select.

At this point it should be said that no charge or suggestion is made of favoritism on the part of the building commission or its members. The questions here involved are almost exclusively questions of law, it being contended on the part of the relator that the building commission is by law required to award the contract to the lowest bidder, and by the defendants (first) that under the statutes applicable, the commission is not so restricted in making its award, and (second) that even if so restricted, the commission did award the contract to the lowest bidder within the meaning of the statute law.

It is admitted by the relator that the successful bidder, the McCaul Company, was low upon the alternatives (of construction and material) finally adopted by the building commission, but the position is taken that the specifications calling for alternative bids are not in conformity to law and that the contract should be re-let upon new specifications from which all alternatives must be eliminated.

The first question to be determined is, therefore, by what provisions of the statute law the building commission is controlled.

The building commission is composed of the three elected county commissioners and four freeholders of the county, ap-

pointed by the common pleas court.   Where it has been decided
to erect a court house costing more than $25,000 such body—the
building commission—is the only one empowered to plan, con-
tract for and carry ·out the construction of the building.   The
legislation under which the building commission is constituted
was enacted in 97 Ohio Laws, 111, amended in non-essential de-
tail in 98 Ohio Laws, 53, and found in Sections 2333-2338 inclu-
sive, of the General Code.   The gist of that legislation is con-
tained in Section 2338, General Code, as follows:

"After adopting plans, specifications and estimates, the com-
mission shall invite bids and award contracts for the building,
and for the furnishing, heating, lighting and ventilating it, and
for the sewerage thereof.   Until the building is completed and
accepted by the building commission, it may determine all ques-
tions in connection therewith *and shall be governed by the pro-
visions of this chapter relating to the erection of public build-
ings.*"

The chapter in which Section 2338 is found is under the title
of "Public Buildings" and bears the sub-title of "Building Reg-
ulations."   The earlier sections of the chapter are devoted to
state buildings, a further grouping of sections relates to county
buildings and bridges, and the final sections come under the sub-
heading of "General Provisions."   Sections 2333-2338 inclusive,
comprise a re-statement or codification of the court house build-
ing commission act.   Subsequent sections of this chapter relate
to county bridges, to the building of infirmaries, children's homes,
and court houses costing less than $25,000.   By Section 2355,
originally applicable exclusively to the construction of public
buildings by the county commissioners, it is provided:

"Such contract, so far as it relates to public buildings or bridge
sub-structures shall be awarded to and made with the person
who offers to perform the labor and furnish the materials at
the lowest price."   *   *   *

It is the contention of the relator, and this contention is
fundamental to the case, that the provision of Section 2355 just
quoted is mandatory upon the building commissioners, being in-
corporated in the court house building commission law by the

final clause of Section 2338 above italicized. The statute authorizing and governing the court house building commission as originally enacted in 97 Ohio Laws, did not contain the clause referred to, and under the law as originally enacted the court house building commission possessed a wide and almost unlimited discretion and was not bound to award the contract to the lowest bidder, nor even to that bidder who was lowest and best. This was squarely determined by the Supreme Court in the case of *McKenzie* v. *State*, decided June 4th,, 1907, and reported in 76 O. S., 369, reversing the Circuit Court of Cuyohoga County which, in the same case, reported in 9 C.C.(N.S.), 105, had held that the building commissioners were subject to the general provisions of the chapter relating to public buildings, and in particular to the requirement of the present Code, Section 2355, requiring the contract to be awarded to "the person who offers to perform the labor, and furnish the materials at the lowest price."

In the case at bar the position is taken on behalf of the building commission that the powers of the commission are such as they were adjudged to be in the McKenzie case in 76 O. S., and that the clause added to Section 2338 to the effect that they "shall be governed by the provisions of this chapter relating to the erection of public buildings of the county" is no more than an unauthorized interpolation by the codifying commission inadvertently enacted into law by the General Assembly in the passage April 2d, 1906, of Senate Bill No. 2, otherwise known as the General Code. In support of this position it is argued that the final clause of Section 2338 is incompatible with and repugnant to the earlier provisions of the same section. Thus it is said that the original wording of Section 2338 and the original wording of the independent Building Commission Act, 97 Ohio Laws, conclude as follows:

"Until the building is completed and accepted by the building commission it may determine all questions connected therewith."

This language was given a definite and final construction by the Supreme Court in the McKenzie case, 76 O. S., and that interpretation and construction (it is contended) will continue to be the meaning of the law so long as the same words remain unre-

pealed on the statute books; that as so construed by the Supreme Court, the building commission was not controlled or limited by other provisions of the statute requiring an award to the lowest bidder, but might, if it chose, award to the highest bidder. As said by the Supreme Court:

"The building commission must in some way resort to competitive bidding because it is required to invite bids; but it is not said or implied that the commission must conform to the procedure described for the county commissioners under like circumstances. * * * It is not said or intimated that the contracts must be awarded to the lowest or to the lowest and best bidder."

It is urged with much force that in the case at bar this court is concluded by the construction of the Supreme Court in the McKenzie case, and that the addition to the building commission law (the last clause of Section 2338) is to be regarded as a mere legislative inadvertence.

Upon the oral argument of this case I was somewhat inclined to this view but upon reflection I consider it untenable.

The final clause of Section 2338 constituting new matter enacted by the General Code discloses no necessary inconsistency between the law governing the building commission and other provisions of the law governing the erection of public buildings by county commissioners. When it is said by the Legislature, as it was said, that the building commission, although empowered to determine all questions connected with the building, shall nevertheless be governed by other provisions of the statutes relating to the erection of public buildings, the unlimited discretion theretofore entrusted to the building commission was qualified so as to regulate its proceedings by other sections of the chapter on building regulations applicable to the erection of a court house. Sections of the chapter applying solely to the erection of bridges, of county infirmaries and of children's homes are manifestly of no concern to the court house building commission and in nowise limit its procedure or authority. Other provisions, however, having to do with the erection of court houses by county commissioners might be made part of the law governing the building commission if the Legislature, by apt language, chose to make them so.

When the McKenzie case was decided in 76 O. S., the Legislature had enacted the court house building commission statute, 97, Ohio Laws, 111, but had not sought by reference or in any manner to incorporate in that law the general provisions of the Revised Statutes. The Supreme Court accordingly refused to do by implication or construction what the Legislature had failed to do. The court speaking through Davis, J., said:

"Certainly the rule can not be invoked to read into the later act whole sections of former acts when there is no intimation of such an intent on the part of the Legislature; for it is to be presumed that the Legislature knew the existing law and it was the easiest thing possible, if it were intended that this building commission should be controlled by the existing law, to have so said without otherwise defining the powers and duties of the commission."

The enactment of the General Code, including Section 2338, in its present form was subsequent to this expression of the Supreme Court, and for aught that appears, the concluding language of the section may have been in response to the intimation of the Supreme Court. The question here considered later arose in the case of *State, ex rel*, v. *Cass*, 13 C.C.(N.S.), 449 wherein a contract let by the court house building commission of Cuyahoga county was sought to be enjoined for the failure of the commission to award the contract to the lowest bidder.

The circuit court among other grounds, held that the building commission of that county possessed the wide discretion given it by the original building commission act under the construction of the McKenzie case, notwithstanding the adoption in the meantime of Section 2338 of the General Code in its present form. This conclusion, however, was reached upon the sole ground that the court house commission had been constituted prior to the enactment of the General Code and that the construction by it of the new court house, commenced before the enactment of the Code, constituted a *pending proceeding* within the meaning of Section 26 of the General Code making the amendment of Section 2338 inapplicable. This conclusion on the ground last stated was made the specific basis for the affirmance of the case by the Supreme Court. Although the difficulty, and I may say,

danger, of construing the law of Ohio upon the basis of the affirmance without report of the lower courts by the Supreme Court is generally recognized by the bar, I nevertheless feel that the journal entry in the Cass case, 84 O. S., 433, is authority for the conclusion here reached.

Moreover, while I permit myself to doubt whether there ever existed an affirmative legislative intent to qualify the building commission law by making the commission subject to general provisions of the statutes relating to public buildings, yet I am unable to find in the last clause of Section 2338 matter so incompatible with or so repugnant to the prior provisions of that section as to justify a judicial repeal of the clause referred to.

This conclusion is apparently in accord with the reasoning of Judge Hunt in *State, ex rel Green,* v. *Edmondson,* 23 O. D., 85 at p. 91, where it is said:

"Such clause (the last of Section 2338) is a recognition and acceptance of their (the building commission's) independence, as established by the case of *McKenzie* v. *State,* because if for the the purpose of building a court house the building commission were merely a changed form of the body known as the county commissioners, or the appointed members were simply auxiliary to the county commissioners as claimed, such provision of the General Code would have been entirely unnecessary, the county commissioners, without such provision being governed by the provisions relating to the erection of public buildings."   *   *   *

It follows from the view thus expressed, if that view be sound, that the court house building commission of Hamilton county is controlled in its proceedings by the general provisions of the chapter upon building regulations so far as those general provisions are applicable to the erection of a court house. Among those general provisions so applicable is that of Section 2355 requiring the contract to "be awarded to and made with the person who offers to perform the labor and furnish the materials at the lowest price."

Thus in the present case the question is squarely raised whether the award of the contract for building the new court house to the McCaul Company was an award to the lowest bidder, or whether, as contended by the relator, the method of receiving bids and

making the award was such that the lowest bidder could not be determined. As the McCaul Company's bid was admittedly the lowest upon the alternatives finally adopted, the question thus presented finally becomes nothing more nor less than the question of whether or not alternative bidding is permissible under statutes requiring contracts to be awarded to the lowest bidder.

The argument on this score advanced in behalf of the relator has already been sufficiently stated. This argument—that there can be no determination of the lowest bidder unless there be a prior determination of the precise form of construction exclusive of alternatives—is thought to find support in the provisions of Section 2343, as follows:

"When it becomes necessary for the commissioners of a county to erect or cause to be erected a public building, or sub-structure for a bridge, or an addition to or alteration thereof, before entering into any contract therefor or repair thereof or for the supply of any materials therefor, they shall cause to be made by a competent architect or civil engineer the following: full and accurate plans showing all necessary details of the work and materials required with working plans suitable for the use of mechanics or other builders in the construction thereof, so drawn as to be easily understood; accurate bills, showing the exact amount of the different kinds of material, necessary to the construction, to accompany the plans; full and complete specifications of the work to be performed showing the manner and style required to be done, with such directions as will enable a competent builder to carry them out and afford to bidders all needful information; a full and accurate estimate of each item of expense, and of the aggregate cost thereof."

It is contended that specifications providing for the use in the alternative of different materials or different forms of construction do not constitute "full and complete specifications," nor can an estimate contemplating the adoption of one of several alternative proposals be regarded as a "full and accurate estimate of each item of expense and of the aggregate cost thereof." Furthermore it is suggested that where the choice of alternatives is left open that "accurate bills showing the exact amount of the different kinds of material" can not be, or at least, are not made. Finally, assuming these points to be established, it is pointed

out that the statutory preliminaries to the making of a public contract can not be avoided or waived by any or all parties to the proceeding and that a contract for public work entered into without the observance of statutory prerequisites is absolutely void. As to this latter point many cases are cited which will not be referred to because they are familiar and because the necessity in this state of a complete observance by public bodies of every statutory prerequisite to contract is well understood.

The argument against the validity of alternative bidding finds its chief support in the decision of the Circuit Court of Cuyahoga County in the McKenzie case already referred to. Syllabus 3 of that case is, in part, as follows:

"Before bids are invited for a public building the commission having the matter in charge must make the specifications so definite and certain as to material as to leave no discretion with the commission in the acceptance of the lowest bid."

The court, acting upon this principle, enjoined the Cuyahoga county court house commission from entering into a contract for the reason, among others, that the commission reserved to itself the right to determine after opening the bids, whether limestone, sandstone or granite should be used in the construction. At p. 112 of the report in 9 C.C.(N.S.) the court says:

"In the matter of general materials for a public building no discretion as to the choice can lawfully be reserved until after the bids are opened, when the statute expressly requires, as it does here, that the specifications should be made in advance, and that the contract should be let to the lowest bidder. To hold otherwise would be to strike at the very root and foundation of these requirements of the statute. For if the law does not apply in letter and spirit to gross raw materials like these, what is left? The law forthwith becomes a dead letter."

If the opinion of the circuit court in the McKenzie case, or so much of it as has been quoted is the law of Ohio, further discussion of the case at bar is entirely needless and the prayer of the relator for an injunction must be granted. The subsequent history of the McKenzie case has already been stated, though from a somewhat different point of view. The decision of the circuit

court was reversed by the Supreme Court upon the sole ground apparently that under the law as it then stood the building commission of Cuyahoga county operated under an independent statute and was not bound to award the contract to the lowest bidder in pursuance of other provisions of the Revised Statutes, notably that now numbered 2355 of the General Code. It is therefore contended by the relator here that the McKenzie case, having been reversed by the Supreme Court upon another and independent ground, is still the law of Ohio upon the point stated in Syllabus 3 above quoted, as to which the Supreme Court expressed no opinion. I can not accept this view. The decision in the McKenzie case by the circuit court was reversed by the highest court of the state and there is no presumption that because the lower court erred as to one ground of its opinion that it was correct in the other grounds stated by it which the Supreme Court did not think it necessary to review. Accordingly, I consider the opinion of the circuit court in the McKenzie case as of no higher authority than naturally attaches to the individual views of the able judges then sitting. Those views— upon the subject of alternative bids—are said to find support in the case of *Hertenstein, Tax-Payer,* v. *Herrmann et al,* 6 N. P., 93. In that case the board of water works commissioners of Cincinnati advertised for bids for embankment work under specifications which called for estimates upon items of dry paving and sodding, or in the alternative, for rip rap and sowing in grass. Upon one alternative a certain bidder was low, but upon the other alternative another bidder was low. After opening the bids the commissioners adopted dry paving and sodding and awarded the contract to the low bidder upon that form of construction, whose bid, however, was several thousand dollars higher than the low bid for rip rap and sowing. The following is from the opinion:

"It is contended that the board may advertise in the alternative form as to various classes of work to be done and materials to be furnished, and after the bids are received it may then finally determine what its specifications will be and award the contract to that bidder whose bid is found to be the lowest for the work according to the specifications adopted after the bids have been received. Such was the course pursued in this case.

"I am of the opinion that such a course violates both the letter and the spirit of the law."

This vigorous language of a former judge of this court would have great weight in the determination of the case at bar if it had been applied to facts at all analogous to those of the present case. Upon analysis, however, it will be found that the Hertenstein case affords no parallel in the present instance. In the Hertenstein case the water works board had adopted the specifications and approximate estimates of quantity of its engineer. The bidders were then asked to submit their figures for doing the work at so much per cubic yard or per lineal foot, and a computation of bids was had upon the basis of the engineer's approximate estimate of quantities. This practice is the one commonly followed with reference to similar work. What then occurred was this: The water works commission, after it had opened and computed the bids, changed the engineer's estimate of approximate quantities and by this process the contractor whose bid was low when computed by the original estimate of the engineer became high when that estimate was amended by the water works commission. This appears in the opinion of the court thus:

"Subsequently" (after the original computation of bids) "the board concluded that it would use a greater quantity of dry paving and sodding than it would use of rip rap and sowing in grass and thereupon awarded the contract to the David Folz Company."

The opinion of the court above quoted must be read therefore in connection with the exact facts of the case, and so considered, the views of the court would hardly be questioned today by any one. It is scarcely necessary to point out that in such form of bidding it is the engineer's approximate estimate of quantities which alone gives certainty in the computation of bids, so that a subsequent alteration in the approximate estimate necessarily destroys every element of competition in such bidding.

The Hertenstein case, therefore, is in no sense an authority against the validity of alternative bidding.

On the other hand the propriety and validity of calling for bids upon alternative specifications has repeatedly been deter-

mined in this state. *Ampt* v. *Cincinnati*, 17 C. C., 516, affirmed without report 60 O. S., 621; *State* v. *Toledo Board of Education*, 14 C. C., 15; *Polhamus* v. *Board of Education*, 21 C.C., 257, 259; *Emmert* v. *Elyria*, 6 N.P.(N.S.), 381, affirmed 74 O. S., 185. Numerous other authorities have been cited to the same effect.

The cases specifically mentioned above were all considered by the circuit court in the McKenzie case and in the language of the judges, gave them "pause." In the opinion, however, it was pointed out as it is in the present case urged in argument, that in every case in Ohio where alternative bidding was approved by the courts, one or both of two conditions obtained: either (1) the controlling statute permitted an award to the "lowest and best" bidder, thus conferring discretion; or (2) the subject-matter of the contract involved the use of material or machinery which was patented or of a proprietary character, or the work specified was of a non-competitive or partially non-competitive character.

These elements of possible distinction are indeed present in most if not all of the authorities referred to in Ohio. It remains to consider, therefore, whether the line of distinction suggested is a logical or valid one, and if so, whether the controlling statute in the present case warrants the application of such distinction to the facts of the case at bar.

Where by statute a public contract may be awarded to the "lowest and best" bidder, it is settled that officials empowered to contract may pass over the proposals of the lowest bidder or bidders and award to a higher bidder who may be determined to be better because of experience, responsibility or peculiar qualification for the work. The discretion conferred in such cases may be exercised whether the specifications are rigid or permit bids upon alternatives. The existence of such discretion is not therefore the *reason* for permitting alternative bidding. True, if the various bidders may present their own specifications, each bidder furnishing with his proposal his own plan of construction (as may be done by bidders upon bridge superstructures, Section 2345, General Code), it is impossible mathematically to determine the *lowest* of such bids, and in the nature of things, the award

can only be to the "lowest and best." But, if, as in the present case, all specifications including all possible alternatives are prescribed in advance by the contracting board or official, it is mathematically possible to determine the lowest bid upon any alternative or set of alternatives.

In the present case it is admitted that the bid of the McCaul Company is the lowest upon the group of alternatives finally decided upon by the building commission. The criticism advanced by the relator in this case of the method here followed, would be nearly if not quite as valid if the statute permitted the building commission to award to the "lowest and best." In the case last supposed it might be urged that the "best" bidder should be determined solely with reference to the experience, responsibility and availability of the bidder for the *particular* work proposed, just as the "lowest" bidder should be determined mathematically; and that to allow the commission after examining all bids to make one bidder "lowest" or "best" by selecting the alternatives upon which such bidder excelled, would be to violate the intent of the statute and put a premium upon favoritism.

Thus it seems to me that relator's contention goes to a question of public policy supposed to underlie the statutes relating to public contracts, rather than to the requirements of the statutes themselves. For there is no word in the statute law forbidding the use of specifications in the alternative. It was this conception of public policy which misled (as I think) the circuit court in the McKenzie case. That court, referring to decided cases in which alternative bidding was sanctioned, said:

"Shall we allow these precedents to emasculate the statute? Shall we swing wide the door of official discretion which experience teaches is too often but another name for graft and corruption? No corruption is charged or indicated in this case. But we are asked so to construe this section as to make it easy for dishonest officials to defraud the tax-payer. Probably no statute, however skillfully framed or wisely construed, can wholly prevent dishonest officials from following their bent. But graft can be made by law more difficult and dangerous and *the courts must be alert so as to construe such laws as to give them the effect intended.*"

A careful reading of the opinion in the McKenzie case will produce the impression that the learned judges read into the statute what they thought good morals and the public welfare demanded the statute *should* mean. In so doing, they were led, with deference I suggest, to an unconscious attempt at judicial legislation. Their construction of the statute requiring an award to the lowest bidder, has not received the affirmative sanction of the Supreme Court which has, on the contrary, by its affirmance of the Ampt case (*supra*) sanctioned, impliedly at least, a resort to alternative bidding.

On the question of public policy so far as it enters into the construction of this statute, and as to the admissibility of alternative bidding, the opinion of Cooley, J., in *Attorney-General* v. *Detroit*, 26 Mich., 263, merits intelligent approval:

"It is quite true that if, when the bids are in, council may reject one kind on the ground of its being less valuable than another, it must follow that the bids are not conclusive upon the right to a contract; but that a right in the council to determine the kind is more likely to be exercised from dishonest motives after the bids are in than it would be in deciding what bids should be received is not to my mind very apparent. On the contrary, the broader the door that is opened to competition, the greater will be the number of those who will be interested in watching the proceedings to see that just awards are made, and impartial judgments pronounced."

In the case referred to bids were asked for the construction of a sidewalk and proposals were invited for the use of various materials in the alternative. The statute required the contract to be let to the lowest responsible bidder. Because of the use of alternative specifications the contract was sought to be enjoined, and the case is therefore analogous to the case at bar. In the case of *Mayor of Baltimore* v. *Flack,* 64 Md., 107, the answer of the court will appeal to those experienced in public lettings:

"That such a method as that pursued in this instance may be open to the charge of being dominated by favoritism or of being corruptly manipulated may be true, but it is equally true and more likely that both favoritism and fraud will control if the material is secretly selected and the bids are confined to that one

material, since by inviting proposals for one particular thing or process, public officials necessarily exclude everything else which might have been substituted for the thing called for and there is no greater field for corruption and favoritism than secretly shaping proposals if in fact the city is in corrupt hands.''

In *City of Connersville* v. *Merrill*, 42 N. E., 1112, alternative bidding was again approved. The following language of the court is altogether pertinent to the facts of the present case:

''There was no uncertainty in the material to be used so far as the bidders were concerned. Those bidders were put upon an equality and the city and the property owners had the benefit of competition on each brand or special kind of general material to be used.''

The same point of view is taken inferentially, at least, in *Emmert* v. *Elyria*, 74 O. S., 185.

To the specifications for the Hamilton county court house, the language of Christiancy, J., in *Attorney* v. *Detroit* (*supra*), has exact application:

''The notice, by referring to the respective specifications, gave an equal opportunity to all persons, not only to enter into competition with those seeking to contract for any *other* kind, but also (within the letter and spirit of the charter) to compete with all who chose to bid for any *one particular kind*.''

From another point of view, it is interesting to observe that where, in a public letting, a material or machine is called for which is covered by letters patent or is of a proprietary nature, the courts not only sanction, but actually require alternative proposals, and to this end resort to the extraordinary remedy of injunction. Such was the recent determination of this court. See *Fischer* v. *City of Cincinnati*, 16 N.P.(N.S.), 369, and cases therein cited.

The distinction between patented and proprietary articles or materials on the one hand, and, on the other, what, in the McKenzie case, are termed ''gross raw materials'' is after all a distinction only of degree. Raw materials, even of the commoner sort, are often held in more or less exclusive ownership, and at any rate are capable of being ''cornered.'' The same public

policy or judicial construction which *requires* alternative proposals for materials of the former class should not hesitate therefore to *permit* them in the case of the latter.

In the final analysis, moreover, judicial interpretation of statutes should not depend too largely on the determination of questions of public policy. The statute as the Legislature has written it is the law, and I find therein no prohibition, express or implied, of alternative bidding.

On the subject of alternative bidding some reference should be made to the provisions of Sections 2363 and 2364, General Code, requiring the invitation of separate bids for one or more branches of the work of construction. By the provisions of these sections, particularly Section 2364, the award of a branch contract may be made to the "lowest and best separate bidder." Where the statute contains such provision it seems to be conceded that alternative bidding is permissible. It is the contention of the relator that these sections of the statute are mandatory upon the building commission. If this position is well taken, as I think it is, an extraordinary situation would arise if the use of alternative specifications, with reference to lump bids upon the entire construction, were not permitted.

Certain specific criticisms of the specifications for the new court house and of the method followed in making the award remain to be considered.

Thus it is said that no separate or independent bid was solicited for the making of a plaster model of the building. This criticism is based entirely upon the failure to reserve a space in the bid sheets in which intending bidders might write their proposals. On this point, it is enough to point out that the omission amounts to but little more than a typographical error which deprived no bidder of the right he would otherwise have had. Moreover, the plaster model was purely incidental to the construction work and the commission has perhaps wisely rejected all bids therefor.

Objection is also made to the commission's failure to call for any lump bid for the entire work inclusive both of construction and mechanical equipment. In fact the specifications for the work of construction and for the mechanical equipment are contained in separate pamphlets, but bids for both portions of the

work were received simultaneously.  The evidence, moreover, is to
the effect that very few concerns in the United States, and pos-
sibly not more than one, are organized to undertake both the
work of construction and that of mechanical equipment of a
building of such magnitude.  The course followed by the building
commission was in this respect, therefore, not only proper but
necessary.

A further objection of seeming substance is this: that the man-
date of Section 2364 was violated by the commission's failure to
invite separate bids for the demolition of the old court house,
such work being claimed to be that of a "separate trade or kind
of mechanical labor."  At the time when the building commission
had before it all bids for the construction of the new court house
and for various branches of the work, the county commissioners
had under consideration bids for the wrecking or demolition of
the old court house as an independent undertaking.  The specifi-
cations for the new court house called for bids in the alternative,
inclusive and also exclusive of the demolition of the old court
house.  The building commission had not invited separate pro-
posals for the work of wrecking the old court house.  When the
building commission finally adopted the alternative of includin
in the construction of the new court house the work of wrecking
the old one, the bid of the McCaul Company was found to be
lowest upon such alternative.  However, it appeared in evidence
without dispute that if the county commissioners had accepted
the lowest bid made to them for wrecking the old court house and
had turned the site over to the building commission free of the
old structure and the building commission had thereupon award-
ed the construction of the new building upon the basis of
the proposals made to it, excluding the work of demolition, the
bid of the Bedford Construction Company plus the cost to the
county commissioners of wrecking the old court house would
have been low upon the aggregate work by some $2,500.  In such
case, the advantage of the saving in the sum named would have
gone to the county's general fund and no saving to the court
house building fund would have resulted.  Upon these facts is
based the argument on behalf of relator that the actual award
was not made to the lowest bidder, and it is contended that the

course adopted by the building commission, that of treating demolition of the old building as part of the masonry work of the new, was a course not open to the commission either in fact or in law. On the question of fact there was evidence tending to show that the work of wrecking an old building is that of a trade separate and distinct from the trade of masonry; on the other hand, there was evidence tending to show that where, as here, it was permissible to use, in the construction of a new building, material taken from an old building upon the same site, it is customary and proper, in a technical trade sense, to include the work of demolition in the specifications for masonry work. The evidence referred to is in seeming conflict only. When the work of wrecking a building is the sole matter in contemplation it is doubtless true that such work has come to be considered that of a specialized occupation, but where, as here, the work of wrecking an old building is purely incidental to the erection of a new one upon the same site, and where, as here, it is permissible to use material from the old as part of the masonry work of the new, it is entirely legitimate to include both kinds of work in the specifications for the single branch job of masonry. Moreover, although the building commission was by law obligated to award the work of construction to the lowest bidder after a computation requiring comparison of every lump bid and every aggregation of branch bids, the discretion always rested with the building commission to adopt that alternative which included as part of the construction of the new court house the demolition of the old court house. In this determination—the adoption of such alternative—the discretion of the building commission was absolute, and there is no intimation that such discretion was not exercised in good faith and wisely. For it was clear, upon the evidence, that had the building commission chosen to adopt that alternative of construction which omitted the demolition of the old court house, leaving the work of demolition to be awarded by the county commissioners upon the basis of the lowest bid made to the latter, that the apparent saving of $2,500 to the taxpayers of the county would unquestionably have been more than overbalanced by the loss of many times that sum through inevitable delay, confusion between independent contractors and

expenditure incident to the occupation for a longer period of the temporary court house.

Finally, it is contended that the contract actually entered into with the McCaul Company was not sufficiently certain within the meaning of the statutes in that the building commission by the terms of the contract reserved to itself the right in the future to require the construction of revolving doors in place of the swinging doors contracted for, at an additional cost of $9,500, and to include in the contract fire-proof screens at the intersection of corridors at an added cost of $18,500. These reservations were made in view of expected changes in the building code, which in its present form forbids the use of revolving doors and requires the use of fire screens at the intersections of corridors.

Inasmuch as the building commission at the time of making its award foresaw the probability of future changes in the respects referred to, it would seem to any one at all familiar with building operations that the making of the reservations in question was an instance of commendable foresight on the part of the commission. Moreover, Section 2340, General Code, specifically provides for the making of changes in the construction during the progress of the work. I am at a loss to understand why the building commission should not do at the time of entering into the contract what it is authorized to do at a later time. It is common knowledge that a change in plans made after a building is partly constructed is apt to be much more expensive than if the possibility of alteration had been provided for at the outset. The reservation of the right to make future changes did not abrogate the commission's choice of alternatives as actually made. Hence there was no uncertainty in making the award.

With reference to the various grounds of objection last discussed, it is but fair to note that counsel for the relator refused to seek the judgment of this court upon any of these grounds considered independently and apart from the chief issues in the case. Counsel have thereby added dignity to their able argument and clarified the issue.

For the reasons stated the petition of the relator will be dismissed.